IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Norfolk Division

SHAWN FORREST ENGLE,     )
      )
    Petitioner,     )
      )     Civil No.:    2:13cv557
     v.     )     Criminal No.: 2:09cr70
      )
UNITED STATES OF AMERICA,     )
      )
    Respondent.     )

## RESPONSE OF THE UNITED STATES TO PETITIONER'S
## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

The United States of America, by and through its attorneys, Dana J. Boente, Acting

United States Attorney for the Eastern District of Virginia, and Robert J. Krask, Assistant United

States Attorney, submits this response to Shawn Engle's motion to vacate, set aside, or correct

sentence filed pursuant to Title 28, United States Code, Section 2255.  Engle alleges that counsel

rendered ineffective assistance during pretrial, trial, and appellate proceedings in this case.  For

the reasons stated below, Engle's motion should be denied.

## PROCEDURAL HISTORY

On August 5, 2009, a grand jury returned a 14-count superseding indictment charging

Shawn Engle with production of child pornography, possession of child pornography, enticement

of a minor, and witness tampering in violation of 18 U.S.C. §§ 2251(a)(production - count 1),

2252A(a)(5)(B)(possession - count 2), 2422(b)(enticement - counts 6-8), and 1512(b)(1),

1512(b)(2)(B), and 1512(b)(3)(witness tampering - counts 3-5 and 9-14), respectively.  Doc. No.

18.

Before trial, Engle moved, among other things: (1) to dismiss count 1's charge of producing child pornography on venue grounds, arguing that the offense could only be prosecuted in Pennsylvania where he filmed a minor engaging in sexually explicit conduct; and (2) to suppress evidence, including a digital video camera containing an SD memory card containing the contraband sexual videotape charged in count 1, seized from Engle's 2003 Isuzu Rodeo when he was arrested on an outstanding warrant. Doc. Nos. 20 and 21. After receiving briefing and holding a hearing on these motions on December 2, 2009, the Court denied both motions and issued a written decision specifying the grounds therefor. *United States v. Shawn Engle*, 677 F. Supp. 2d 879 (E.D. Va. 2009). Also prior to trial, on February 26, 2010, the Court dismissed count two at the request of the United States and over the objection of the defendant. Doc. Nos. 70, 73, 74, and 87.

After a four-day trial, on March 5, 2010, a jury convicted Engle on all remaining counts in the superseding indictment. On July 12, 2010, the Court sentenced Engle to serve 480 months in jail, imposing concurrent terms of 360 months of imprisonment on count 1, 240 months on counts 3-5 and 9-14, and 480 months on counts 6-8. Doc. No. 121.

Engle then noted an appeal challenging the sufficiency of the evidence supporting his convictions for attempting to entice a minor to engage in sexually explicit conduct (counts 6-8) and contending that this Court erred in refusing to dismiss count 1 on venue grounds and in allegedly denying him his right to allocution before sentencing. On February 29, 2012, the United States Court of Appeals for the Fourth Circuit rejected each of these claims. *United States v. Shawn Engle*, 676 F.3d 405 (4th Cir. 2012). On October 1, 2012, the Supreme Court denied Engle's petition for a writ of certiorari.

By mailing dated September 30, 2013, Engle timely filed the pending motion for relief pursuant to 28 U.S.C. § 2255.  *See* Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 3(d).

## FACTUAL BACKGROUND

Many of the facts pertaining to the present motion were succinctly described in the opinions issued by this Court and the appellate court.  With respect to the basic facts supporting the convictions, the Fourth Circuit noted:

> In 2008, Engle, who was then 30-years old, began communicating separately via [I]nternet and telephone with 17-year old "A.M." and 13-year-old "K.M."  At the time, Engle lived in Virginia, A.M. lived in Pennsylvania, and K.M. lived in South Carolina.
>
> Engle communicated with A.M. for several weeks, during which time he sent her (among other things) naked photographs of himself.  Engle twice traveled to Pennsylvania to visit A.M., and on the second visit, he used a video camera to record the two of them having sex.  Engle and A.M. had no further physical contact after this encounter.  The sexually explicit recording involving A.M. was later found by law enforcement officers in Virginia during a search of Engle's vehicle.  As a result of this conduct, Engle was indicted in Count 1 for violating § 2251(a).
>
> K.M. came from a troubled family environment, and Engle communicated with her over a longer period of time.  Engle cultivated an emotional attachment between them, and he ultimately traveled to South Carolina, picked up K.M., and returned with her to Virginia.  K.M. stayed with Engle for several weeks, and they had sexual relations during this time.  Eventually, law enforcement arrested Engle, and he was charged with state-law crimes in Virginia and South Carolina.  While he was incarcerated in Virginia pending trial, Engle communicated by mail and telephone with K.M. and her mother, "C.M.," in an effort to have them falsify evidence for him.[1]
>
> Also while incarcerated, Engle had three communications (2 letters, one telephone call) with K.M. in which he expressed his

---

[1] Four of these communications are the subject of the witness tampering charges underlying Counts 9-11 and 14. Engle also communicated with other witnesses, and those communications underlie the witness tampering charges in counts 3-5 and 12-13.

> love for her and his desire to reunite with her. In these
> communications, he made multiple references to their past sexual
> experience and to his desire to resume their sexual contact upon his
> release. Based on these communications, Engle was indicted in
> Counts 6-8 for violating § 2422(b).

*Engle*, 676 F.3d at 411.

The facts pertaining to apprehension of Engle and the search of his vehicle on October 24, 2008, developed at both the December 2, 2009 suppression hearing and at trial, are follows. After Engle transported K.M. to Virginia Beach in late August 2008 as described above, K.M.'s father made a missing persons report concerning his 13-year-old daughter to the Sheriff's Office in Greenville County South Carolina. Trial Tr.[2] 151. A search of the minor's cellular telephone by an investigator with the Greenville County Sheriff's Office revealed a series of text messages, dated August 20-22, 2008, to and from an area code "757" telephone number belonging to Engle. Trial Tr. 157-61. In these messages, Engle offered to drive to South Carolina to pick up K.M. and offered to let her stay with him for a while, indicating that his home was her home. Trial Tr. 163. Suspecting that the minor may have traveled to Virginia, on September 2, 2008 the South Carolina investigator contacted Engle at the "757" telephone number noted above and asked, among other things, if he knew where K.M. was located. Trial Tr. 164-65. Engle falsely stated that he had no idea where K.M. was, agreed to contact South Carolina authorities if he heard from her and, when asked for an address at which local police could find and interview him about the matter, provided a Virginia Beach address (on 33rd Street) where he claimed to be living with a group of Russians. Trial Tr. 165-66. When Detective Alan Everett of the Virginia Beach Police Department attempted to find Engle and/or K.M. at the 33rd Street address provided by Engle, however, he found no sign of them. Trial Tr. 283-85.

---

[2] "Trial Tr." refers to the transcript of the trial on file with the Court.

Engle did not thereafter contact the South Carolina investigator to report any information about K.M.'s whereabouts. Trial Tr. 166. Yet, just two weeks later on September 16, 2008, a police officer found both Engle and K.M. at Engle's mother's house in Gates County, North Carolina. Trial Tr. 236-37. As the officer escorted K.M. out of the residence to return her to her family in South Carolina, Shawn Engle repeatedly told K.M. "don't say anything." Trial Tr. 223. Later that same evening, after being advised that South Carolina had obtained an arrest warrant for Engle on the charge of kidnapping, Trial Tr. 178, the Gates County police officer obtained a fugitive warrant for Engle and returned to his mother's residence to arrest him, but no one answered when the officer knocked at the door. Trial Tr. 239-40.

Following the recovery of K.M., she made statements about travel to Virginia Beach that caused renewed efforts both to locate Engle and to develop any evidence of potential crimes he may have committed there. Trial Tr. 285-86. As part of these efforts, Detective Everett disseminated a "wanted" poster within the Virginia Beach Police Department, which poster identified Engle and his vehicle and tag number and listed the charges lodged against him elsewhere. Trial Tr. 286.

This led to the events described in this Court's ruling on the defendant's motion to suppress.

> On October 24, 2008, a Virginia Beach patrol officer reported seeing [Engle]'s vehicle parked at the 4800 block of Westgrove [R]oad. The VBPD dispatched two officers, Officer Shank and Officer Cahill to the location. The officers arrived at 4817 Westgrove in marked police vehicles at approximately 3:43 p.m., and took up positions on the streets near the residence. Shortly thereafter, Officer Shank observed [Engle] driving away from the residence in a 2003 Isuzu Rodeo with North Carolina license plates. As Officer Shank followed the vehicle, [Engle] made a series of right turns, turning back toward 4817 Westgrove.[3]

---

[3] While following the vehicle and before he made a traffic stop, Officer Shank observed Engle use hand signals because the turn signals of the vehicle were not working. Trial Tr. 274-75 and 280.

Before [Engle] could pull into the driveway, Officer Shank activated his siren. [Engle] pulled into the driveway of 4817 Westgrove, parking his vehicle on the driveway and partly on the grass in front of the home.

[Engle] stepped out of the vehicle, and Officer Cahill placed him in custody inside a police vehicle shortly after 4:00 p.m. The officers verified [Engle]'s identity by examining his driver's license, which was issued by the state of North Carolina. The officers also used a computer to verify [Engle]'s driver's license. The results indicated that [Engle]'s address was a residence in North Carolina.[4] When questioned, [Engle] indicated that he was visiting the residence at 4817 Westgrove, and that he stayed at the location for two to three days from time to time. Officer Cahill transported [Engle] from the scene at approximately 4:13 p.m.

Officer Shank remained at the scene at 4817 Westgrove. He knocked at the door of 4817 Westgrove, but no one answered. He then contacted a sergeant with the VBPD for instructions concerning [Engle's] vehicle. The sergeant instructed Officer Shank to impound the vehicle, and a wrecker was called to tow the vehicle. Pursuant to VBPD policy, Officer Shank began to inventory the vehicle's contents. Officer Shank inventoried a number of items in the vehicle, including knives in a nylon pouch, an iPod, and a cellular phone.

Meanwhile, at the VBPD detective bureau, Detective Everett conducted an interview of [Engle]. Detective Everett had previously been contacted by the [Greenville County Sheriff's Office], and was aware of K.M.'s statement concerning her abduction. According to Detective Everett, [Engle] admitted to knowing K.M., but was unwilling to provide further details. Once the interview was completed, Detective Everett went to 4817 Westgrove Road.

Upon arrival, Detective Everett instructed Officer Shank to stop his inventory. Detective Everett reviewed the inventory sheet that Officer Shank had prepared, and ordered the knives, cellphone, and iPod seized. These items were removed from the car and logged into evidence. Detective Everett then inventoried the remaining contents of [Engle]'s vehicle. He discovered several items, including a digital video camera, an "SD" memory card, and various phone records. All the items discovered by Everett were listed on a "Property and Evidence Voucher" executed by Everett.

---

[4] This residence was the same address at which K.M. was recovered just over a month earlier. Tr. 234, 263.

> Two days after [Engle]'s arrest, on October 26, 2008,
> Detective Everett secured a warrant to search the camera, the
> cellphone, and memory card seized from [Engle]'s vehicle.  A
> search of the cellphone revealed several messages between K.M.
> and [Engle], as well as several pictures of A.M.  A search of the
> memory card uncovered a 45-minute video showing Engle
> engaged in sex with an individual, [later discovered to be A.M.].

*Engle*, 677 F. Supp. 2d at 882-83.  Based upon these facts, this Court denied Engle's motion to

suppress and stated:

> The Court finds that this search was valid under the inventory
> search exception to the Fourth Amendment's warrant requirement.
> *See United States v. Brown*, 787 F.2d 929 (4th Cir. 1986).
> Although this initial inventory search was interrupted and some of
> the evidence was located by a detective, the Court finds that the
> detective's search was a continuation of a valid inventory search
> and, in any event, any evidence seized by this detective would
> inevitably have been discovered pursuant to the initial inventory
> search.

*Id.* at 881.

## STANDARD OF REVIEW

Analysis of defendant Engle's complaints about the performance of his trial and appellate

counsel must begin with the proposition that a conviction is presumed valid on collateral attack,

and a prisoner bears a heavy burden to establish that any error alleged "is sufficiently

fundamental to come within th[e] narrow limits" of claims that warrant collateral relief.  *United*

*States v. Addonizio*, 442 U.S. 178, 184-85 (1979); *see Parke v. Raley*, 506 U.S. 20, 29-30

(1992)(discussing the presumption of regularity that attaches to final judgments).  The central

consideration underlying habeas jurisprudence is that a facially valid, final judgment of

conviction is entitled to great respect.  *E.g., United States v. Frady*, 456 U.S. 152, 165 (1982).

Section 2255 authorizes a prisoner to attack a sentence that holds him in custody on the grounds that: (1) the "sentence was imposed in violation of the Constitution or laws of the United States," (2) "the court was without jurisdiction to impose such sentence," or (3) "the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255, ¶1. This legal remedy is not a tool with which a frustrated defendant can force a court's attention to any and every aspect of his case, but instead is designed to address only those defects that are constitutional, jurisdictional, or in some other respect fundamental. *See Addonizio*, 442 U.S. at 185; *see also Davis v. United States*, 417 U.S. 333, 346 (1974)(not every asserted error of law constitutes a complete miscarriage of justice).

The customary method of raising and correcting alleged trial court error is by appeal. *Sunal v. Large*, 332 U.S. 174, 177 (1947). A petitioner who asserts in a 2255 motion a constitutional error not raised at trial, sentencing, or upon direct appeal, must satisfy a two-part "cause and actual prejudice" test to collaterally attack his conviction. *Frady*, 456 U.S. at 167-68. Under that test, "a convicted defendant must show both (1) 'cause' excusing [his] double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *Id.*; *United States v. Maybeck*, 23 F.3d 888, 890 n.1 (4th Cir. 1994). Failing that, a petitioner may also obtain relief under very limited circumstances by showing that a court's refusal to entertain the alleged errors would result in a complete miscarriage of justice. *Reed v. Farley*, 512 U.S. 339, 348 (1994); *Frady*, 456 U.S. at 167-68. This standard presents "a significantly higher [standard] than would exist on direct appeal." *Frady*, 456 U.S. at 166.

The scope of review for non-constitutional error is more limited than that for constitutional error. To successfully assert the former as grounds for collateral attack, one must show that such error "involves 'a fundamental defect which inherently results in a complete

miscarriage of justice,' *Addonizio*, 442 U.S. at 185, or is 'inconsistent with the rudimentary demands of fair procedure.'" *United States v. Mikaljunas*, 186 F.3d 490, 495-96 (4th Cir. 1999), *overruled on other grounds, Dretke v. Haley*, 541 U.S. 386 (2004); *Noble v. Barnett*, 24 F.3d 582, 586 (4th Cir. 1994).

A petitioner seeking to vacate a sentence due to the alleged, ineffective assistance of counsel must prove both "(1) deficient performance and (2) prejudice."[5] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Beck v. Angelone*, 261 F.3d 377, 392 (4th Cir. 2001). To prove deficient performance, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," for example, by establishing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687-88. Reasonableness is measured against "prevailing professional norms." *Strickland*, 466 U.S. at 688, and is judged "on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

To guard against hindsight bias and unfair "second-guess[ing]," a defendant must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. This means that "courts must be highly deferential in scrutinizing counsel's performance," *Kratsas v. United States*, 102 F. Supp. 2d 320, 322 (D. Md. 2000), and strive "to avoid 'the distorting effects of hindsight.'" *Yarbrough v. Johnson*, 520 F.3d 329, 337 (4th Cir. 2008)(quoting *Strickland*, 466 U.S. at 689). Such an approach properly recognizes that "[c]ounsel is not ineffective merely because he overlooks one strategy while vigilantly pursuing another." *Williams v. Kelly*, 816 F.2d 939, 949-50 (4th Cir. 1987). Indeed,

---

[5] As noted by the Supreme Court, "an ineffective assistance of counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *United State v. Massaro*, 538 U.S. 500, 123 S. Ct. 1690, 1694 (2003).

"[a] tactical decision is ineffective only 'if it was so patently unreasonable that no competent attorney would have chosen it.'"  *Holladay v. Haley*, 209 F.3d 1243, 1253 n.6 (11th Cir. 2000) (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)).

Proof of prejudice requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  As a result, a petitioner must do far more than identify errors that "had some conceivable effect on the outcome of the proceeding."  *Id*. at 693; *see also Frady*, 456 U.S. at 170 (to demonstrate prejudice, a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions"); *Cousins v. Greene*, 416 F. Appx. 278, 282 (4th Cir. 2011)("prejudice analysis necessitates an assessment of the effect, if any, the unintroduced evidence  might have had on the verdict, in light of the evidence actually presented").

Failure to meet either prong defeats a petitioner's ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 700.  The burden of establishing grounds for collateral attack rests with a petitioner, who must prove his claims by a preponderance of the evidence.  *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).  When "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," then a court may decide the matter without holding a hearing upon a petitioner's motion.  28 U.S.C. § 2255, ¶2; *United States v. Rowland*, 848 F. Supp. 639, 641 (E.D. Va. 1994).   These standards govern the resolution of Engle's motion, which should be denied for the reasons noted below.

The undersigned contacted counsel for the Federal Public Defender's Office concerning Engle's motion.  Pursuant to office policy, counsel with the Federal Public Defender's Office

declined to provide the undersigned with sworn affidavits addressing Engle's allegations and advised that such will be provided only in response to a court order. The United States submits that the facts and circumstances are sufficiently clear to enable the Court to rule upon Engle's motion without such affidavits. Should the Court, however, find it necessary for trial and appellate counsel to answer the allegations raised in Engle's motion, the United States requests that the Court issue the appropriate order directing the Federal Public Defender to respond.

## DISCUSSION

**I.. *Engle's Claims of Ineffective Assistance of Counsel Are Without Merit***

**A. *Engle Has Failed To Demonstrate Prejudice***

Engle's § 2255 motion raises a series of pre-trial, trial, and appellate claims regarding the performance of counsel, each of which is discussed in more detail below. Before undertaking that task, however, it is important to note that Engle has failed to demonstrate prejudice with respect to *any* of his claims. Stated another way, he has not met his burden of showing a reasonable probability that, but for counsel's alleged errors, the outcome of his case would have been different. *See Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

The absence of prejudice results from the fact that, at trial, the United States presented overwhelming evidence of Engle's guilt on all the charges in the superseding indictment presented to the jury. This evidence included: (1) the testimony of 29 witnesses, including A.M.; (2) Engle's videotape of his sexual encounter with A.M., GX[6] 41A; (3) incriminating text messages showing Engle's efforts to lure K.M. to Virginia, GX 4C-4M; (4) testimonial and DNA evidence linking K.M. to Virginia, GX 27 and 28A; (5) mail and telephonic evidence of Engle discussing past sexual encounters with K.M. and enticing her to renew their sexual relationship

---

[6] "GX" refers to the government exhibits admitted into evidence at trial.

upon his release from jail, GX 13A, 14A, and 16A-16B ; (6) photographs of Engle with K.M., GX 37A-37B; (7) social networking account evidence, GX 5A-5M; (8) cellular telephone cell site evidence documenting Engle's trips to and from South Carolina and Pennsylvania to meet K.M. and A.M., GX 72A-72B, 73, and 74; and (9) mail and telephonic evidence of Engle's efforts to tamper with witnesses with knowledge of his misconduct and thereby obstruct the investigation and short-circuit any prosecution of him, GX 7A, 9A, 11A, 13A, 14A, 16A, 21A, 31A, 32A, 48A, and 49A.

Engle's claims of error cannot surmount this mountain of evidence. Accordingly, regardless of whether counsel made any of the errors alleged in the petition, Engle cannot show prejudice. Therefore, the petition must be denied. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); *Fields*, 956 F.2d at 1297 ("If the defendant cannot demonstrate the requisite prejudice, a reviewing court need not consider the performance prong.").

**B.      Engle's Pre-Trial Claims of Ineffective Performance Should Be Rejected**

**1.      Litigation of the Motion to Suppress Evidence
Seized from Engle's Car (Ground No. 1)**

With respect to the litigation of the motion to suppress, Engle claims that counsel was ineffective in failing to develop certain facts by calling him, as well as his mother and an acquaintance, to testify at the suppression hearing, and by failing to cross-examine Officer Shank about a prior personnel matter. The essence of Engle's claim is that the search of his vehicle and the seizure of his videotape encounter with A.M. were unlawful.

This claim, however, is the very one that able defense counsel presented by way of a pre-trial suppression motion and litigated at the suppression hearing held on December 2, 2009. Engle's complaint, however, is not with counsel's performance, but rather that the law authorized the search about which he complains. The undisputed facts presented during the suppression hearing and at trial show that: (1) an arrest warrant for a serious felony charge had been issued for Engle; (2) soon after his parked vehicle was spotted, Engle was observed driving that vehicle, by a police officer who also observed that the tail light signals on the vehicle did not work; (3) the officer quickly effected a traffic stop to arrest Engle on the warrant; (4) in response, Engle proceeded towards a residential driveway adjacent to where his vehicle was earlier parked and, in non-perpendicular fashion, pulled into the driveway such that the driver's side front tire extended a foot or two into the grass, Suppr. Tr.[7] 25-26; (5) the vehicle bore North Carolina tags; (6) Engle possessed a license with a North Carolina residential address, which was corroborated by a computer check of his identity; (7) although Engle told Officer Shank that he was "visiting" the residence, Suppr. Tr. 15 and 28, no one answered a call to the residence or the officer's knock at the door to confirm this, Suppr. Tr. 14-15; (8) Engle was promptly transported from the scene and Officer Shank, who had been directed to impound the vehicle, began an inventory search of the car pursuant to department policy; and (9) this inventory search was temporarily stopped, when Detective Everett arrived on the scene, who then resumed the search and seized certain items of evidence from the vehicle.

---

[7] "Suppr. Tr." refers to the transcript of the suppression and motions hearing held on December 2, 2009 and on file with the Court.

Based upon these facts, this Court correctly determined that the search of Engle's car without a warrant was a lawful inventory search. *See, e.g., Florida v. Wells*, 495 U.S. 1, 4-5 (1990); *Colorado v. Bertine*, 479 U.S. 367, 371-72 (1987); *United States v. Patterson*, 150 F.3d 382, 386-87 (4th Cir. 1998)(approving inventory search following warrantless seizure of vehicle used to commit crime). This is true regardless of Engle's unsupported claims that, if called to testify at the suppression hearing, a friend could have substantiated his connection to the residence and his mother would have driven from North Carolina to pick up the vehicle. These conclusory claims fail to demonstrate ineffective performance or change the legal calculus about the facts known at the time to the arresting officers, even if such claims were properly supported by sworn affidavits. *See Hamilton v. Arthur*, No. 7:06cv00682, 2007 WL 1795690, at *8 (W.D. Va. 2007)("Courts cannot find an attorney ineffective for failing to call a witness when the only evidence of that witness's potential testimony is the Petitioner's conclusory statements.")

Pursuant to section 19.2-80.1 of the Virginia Code, when a driver is arrested and no other person is present at the scene to be designated to drive the vehicle away, an officer "may cause the vehicle to be taken to the nearest appropriate place for safekeeping . . . ." VA CODE ANN. § 19.2-80.1. Neither Engle's friend nor his mother nor anyone else was present at the scene when the decision was made to impound Engle's vehicle and inventory its contents. Also, given Engle's North Carolina licensing and registration information, this Court correctly determined that his claimed connection to the adjacent Westgrove Road residence was "vague and unsubstantiated" and that the decision to impound the vehicle was reasonable under all of the circumstances. *Engle*, 677 F. Supp. 2d at 888; s*ee United States v. Brown*, 787 F.2d 929, 932-33 (4th Cir. 1986)(police could reasonably impound vehicle "because there was no known individual immediately available to take custody of the car, or because the car could have

constituted a nuisance in the area in which it was parked").  Moreover, given Engle's prior false statements concerning his location in Virginia Beach and his claimed lack of knowledge of K.M.'s whereabouts and his forceful instruction to her to keep quiet about their activities, counsel's decision not to call him to testify at the suppression hearing was reasonable and prudent.  Accordingly, Engle has failed to show that his counsel's tactical decision with respect to which witnesses to call at the suppression hearing was "so patently unreasonable that no competent attorney would have chosen it," and constituted ineffective assistance. *Holladay*, 209 F.3d at 1253 n.6 (citation omitted).

Multiple other grounds also support the legality of the vehicle search and the use of the evidence obtained therefrom.  First, as noted by the Court, even if Detective Everett actions in responding to the scene and taking over the inventory search previously begun violated the Fourth Amendment, the evidence he recovered was not subject to suppression because it inevitably would have been seized when Officer Shank completed the inventory of the vehicle's contents prior to its being towed.  *Engle,* 677 F. Supp. 2d at 888-89 (citations omitted).

Second, as argued by the United States in response to the suppression motion, Doc. No. 26 at 13-16, and not reached by the Court in ruling upon the suppression motion, Detective Everett independently possessed probable cause to search Engle's vehicle based upon the facts known to him when he arrived at the scene of the traffic stop.[8]

Third, as also argued by the United States, Doc. No. 26 at 17, even if Detective Everett's

---

[8] Further, the sexual videotape located on the SD card inside Engle's digital video camera, was found and seized pursuant to an October 26, 2008 Virginia Beach search warrant that Detective Everett obtained to search the electronic items and storage media seized from Engle's vehicle.  Doc. No. 26 at 12.  Counsel's tactical decision to challenge the search of the car, which was conducted without a warrant, rather than the search of the camera, which occurred pursuant to a warrant, was objectively reasonable.  *See* Engle Ground No. 13.  Indeed, even if the warrant for the camera was later ruled invalid, because the search was conducted in objectively  reasonable good faith reliance upon the warrant, the evidence obtained therefrom was not subject to suppression.  Therefore, Engle cannot show prejudice resulting from the non-filing of a second suppression motion.

October 24, 2008 vehicle search violated the Fourth Amendment as later construed by the Supreme Court in 2009 in *Arizona v. Gant*, 556 U.S. 332 (2009), he acted in objectively reasonable good-faith reliance on binding precedent authorizing such searches at that time. *See, e.g., United States v. Milton*, 52 F.3d 78, 80 (4th Cir. 1995)(once a person is lawfully arrested following a traffic violation, a police officer may conduct a search of the passenger compartment of the automobile, even if the person arrested has been separated from the vehicle before the search). This Court considered but declined to rule upon this argument when resolving the suppression motion. *Engle*, 677 F. Supp. 2d at 889 ("it is not necessary to decide whether [the searching officers] could have relied in good faith" upon prior precedent authorizing vehicle searches in such circumstances). Since that time, however, the Supreme Court and the Fourth Circuit have spoken on the matter. Fatal to Engle's claim, the Supreme Court's ruling in *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011), established that "searches conducted in objectively reasonable reliance upon binding appellate precedent are not subject to the exclusionary rule," even if that appellate precedent is later overruled. *United States v. Wilks*, 647 F.3d 520, 521 (4th Cir. 2011)(quoting *Davis*, 131 S. Ct. at 2423-24). Because Detective Everett's search of Engle's vehicle following his arrest and removal from the scene comported with binding Fourth Circuit precedent at that time, the evidence seized during that search, including the videotape of Engle's sexual activities with A.M., is not subject to suppression.

Finally, Engle's complaint about counsel's failure to cross-examine Officer Shank about a prior personnel matter arising from a traffic stop should also be rejected by the Court. This is so because no issue exists about the propriety of the Officer Shank's actions in stopping and arresting Engle for South Carolina's outstanding charge of abduction of a minor. Engle does not and cannot claim that he was a victim of some kind of "profiling." Therefore, the failure to

pursue an objectionable and improper inquiry into Officer Shank's prior personnel matter is not actionable as ineffective assistance. *See United States v. Williams*, 740 F.3d 308, 314 (4th Cir. 2013)(upholding, in criminal trial, exclusion of evidence of three civil lawsuits alleging prior police misconduct falling outside the scope of Rule 404(b), against officers who conducted traffic stop of defendant's vehicle).

## 2. Engle's Other Miscellaneous Pre-Trial Claims (Ground Nos. 4 and 13)

Engle also asserts that counsel failed to render effective assistance with respect to the United States' dismissal of count 2 (ground 4) and in failing to move to suppress evidence seized from K.M.'s cellular telephone (ground 13) and for a change in venue due to prejudicial pretrial publicity. Each of these claims is also without merit.

Prior to trial, the United State exercised its prerogative under Rule 48(a) of the Federal Rules of Criminal Procedure to request leave of Court to dismiss count 2's charge that Engle possessed child pornography, that is, the above-described videotape of A.M. Doc. No. 70. Simultaneously, the United States also filed a motion in limine seeking to prevent admission of evidence and assertion of an improper defense that the jury should not convict Engle of the charge in count 1 because he was reasonably mistaken about A.M.'s age. Doc. No. 71; *see United States v. Malloy*, 568 F.3d 166 (4th Cir. 2009)(rejecting claim that one may defend against such a charge of sexually exploiting a minor by asserting a reasonable mistake of age defense).

Notwithstanding that Rule 48(a) expressly authorizes pre-trial dismissal of charges before trial, with or without the defendant's consent, Fed. R. Crim. P. 48(a), defense counsel opposed the request to dismiss count 2 and the government's motion in limine in a written filing. Doc. No. 73. By Order dated February 26, 2010, the Court granted the United States leave to dismiss

count 2 without prejudice.  Doc. No. 87.  And, following a hearing on the morning of the first day of trial, the Court also granted the government's motion in limine.  Unnumbered Doc. Entry Dated 3/2/2010.

Far from providing ineffective assistance, defense counsel went above and beyond the call of duty in seeking a dismissal of count two *with prejudice* and in attempting to preserve -- albeit in manner contrary to law and circuit precedent -- Engle's attempt to muddy the waters and defend against count 1 by claiming that, at the time he made the sex videotape, he believed A.M. to be over the age of 18.

That counsel took these steps, however, did not require them to similarly take other actions with no reasonable prospect of success.  Engle's claims concerning K.M.'s cellphone and pretrial publicity fall into such a category.  With respect to the first item, K.M.'s cellphone was examined by the Greenville County Sheriff's Office in conjunction with the reporting of her disappearance from the family home in late August 2008.  Trial Tr. 151 and 157.  This telephone belonged to K.M., not to Engle.  Trial Tr. 157-64 (discussing evidence showing that K.M. received text messages on the phone from Engle).  Accordingly, Engle lacked standing to contest the seizure of evidence from K.M.'s cellular telephone and had no reasonable expectation that a third party would not access or provide to the government text messages he sent to another's cellular telephone.[9]  *See United States v. Munoz*, 55 F.3d 923 (4th Cir. 1995)(defendant lacked standing to contest the search of a third party, unless he could show

a reasonable expectation of privacy in the area to be searched or in the property seized); *United States v. Rusher*, 966 F.2d 868, 874-75 (4th Cir. 1992)(Fourth Amendment rights are personal and may not be vicariously asserted).

---

[9] Engle's related and wholly unsupported claim that police deleted other messages on K.M.'s phone so that the remaining messages would be subject to misinterpretation is false and without evidentiary support.

Similarly specious is Engle's unsupported claim that counsel should have moved for a change of venue due to alleged pretrial publicity. At the start of jury selection, the first question that the Court asked the pool of potential jurors was whether any of them had "heard or read anything about the case[.]" Trial Tr. 25. Because none of the panel members responded in the affirmative, this matter was not further inquired of during individual questioning of potential panel members. Trial Tr. 36-72. Inasmuch as none of the jurors or potential jurors had any prior knowledge of the case, which was not one that would have otherwise received widespread pretrial publicity, counsel had no grounds or reason to seek the seldom used remedy of moving the trial to another location.

## C. Engle's Trial Claims of Ineffective Assistance Are Without Merit

In grounds 3-5, 7-9, and 11-13, Engle contends that trial counsel failed to render effective assistance in a myriad of ways ranging from the failure to raise or argue certain issues, from the failure to object to certain evidence, the failure to call or properly question certain witnesses, and the failure to offer certain evidence. For the reasons discussed below, the Court should reject all of these claims not only because the defendant has failed to show how counsel's performance at trial has prejudiced his case, but also because the record establishes that counsel reasonably and effectively defended Engle in the face of overwhelming evidence of his guilt. Indeed, Engle's attempt to blame trial counsel for the outcome of his case conveniently ignores the fact that, had he not withdrawn his August 31, 2009 guilty plea and embarked upon of a course of conduct of repeatedly obstructing justice and threatening witnesses, investigators, prosecutors and their family members, he would have likely received a far more favorable outcome to his case.

1.       **Claimed Failure to Subpoena and/or Properly Question Witnesses and Call Engle to Testify on Count 1 (Ground Nos. 3, 5, 11, 12, and 13)**

(A.M.)

Engle alleges that defense counsel failed to subpoena A.M., as well as failed to properly cross-examine her about a variety of topics that may have cast her in a bad light (ground no. 3). No need existed, however, to subpoena A.M. because defense counsel knew the United States would call her and that would provide adequate opportunity to question her. A.M. testified at trial about her relationship with Engle and the events leading up their filmed sexual encounter. Trial Tr. 605-31. During cross-examination, defense counsel questioned A.M. about how she first met Engle, whether she gave Engle a standing invitation to come visit her, whether she selected the hotel for the Engle's second visit, whether another friend was supposed to spend time with her and Engle, about the fact that her Yahoo account (opened when she was 13 years old) falsely reported her age as "twenty-something," about the fact that she did not tell Engle not to come visit her, about her consumption of alcohol during both of Engle's visits and statements she made to law enforcement authorities about that, about her desire to make use of the hotel's hot tub, and about the consensual nature of her sexual activity with Engle. Trial Tr. 620-30. Also, the nature of A.M.'s encounter with Engle and her consumption of alcohol were evident in the videotape received into evidence and viewed by the jury. GX 41A.

Engle's complaints about counsel's questioning of A.M. are without merit and rest upon a misunderstanding of count 1. Count 1 -- which charged Engle with sexually exploiting a minor -- only required proof that: (1) A.M. was under 18 years of age at the time of the offense; (2) Engle used or enticed A.M. to engage in sexually explicit conduct for the purpose of making a film of that conduct; and (3) the sexual videotape was thereafter transported in interstate commerce. Trial Tr. 809-10; *See Engle*, 676 F.3d at 412. At trial, the United States conclusively

proved that A.M. was under age 18 and that Engle traveled to Pennsylvania and made, and was indeed shown in, the sexual videotape, which was filmed with the digital video camera later recovered from his vehicle in Virginia Beach. Having established this, nothing else remained to be proved with respect to count 1.

Recognizing the limited nature of what the government needed to prove, defense counsel prudently sought to suppress the evidence recovered from the vehicle and to have count 1 dismissed on grounds that venue for the charge lay in Pennsylvania, not Virginia. Although these efforts failed, once the trial on count 1 proceeded in Virginia and the videotape was admitted into evidence counsel properly recognized that Engle's defense would not be advanced by unnecessarily attacking A.M. Such tactics, while perhaps appealing to those schooled in TV legal dramas, would have served only to alienate the jury and poison any hope of a trial acquittal. *See Wilson v. Greene*, 115 F.3d 396, 402-04 (4th Cir. 1998)(an attorney's choice of trial tactics, such as whether or not to pursue an available defense, does not transgress the *Strickland* standard); *Williams v. Kelly*, 816 F.2d at 950 (declining to second guess decisions of trial strategy, such as whether to file a motion to strike).[10]

(Failure to Call Engle to Testify)

For the same reasons, Engle's complaint that counsel failed to call him to testify so that the jury could hear his "side of his relationship with A.M." (ground no. 5) also fails. Putting aside Engle's many credibility problems, his repeated and serious attempts to obstruct justice, and the fact that this Court twice advised him of his right to testify at trial, Trial Tr. 686 and 721,

---

[10]In a similar vein, Engle also claims (ground no. 3) that counsel failed to object that A.M.'s parents sat in the courtroom during her testimony and to the fact that the courtroom was not sealed during her testimony. The first claim is simply incorrect. Before trial, A.M.'s mother and her stepfather decided not to be present in Court while A.M. testified and, in fact, were not present for any witness testimony at trial. With respect to the latter contention, although closing a courtroom may be appropriate in rare circumstances, *see, e.g.*, 18 U.S.C. § 3509(e), no grounds existed for doing so in this case.

once the evidence noted above was admitted in the government's case, any possible testimony by Engle about his perspective on his relationship with A.M. or about his belief about her age was effectively irrelevant in light of the elements of crime of sexually exploiting a minor. Therefore, no error existed in declining to seek to present such testimony.

(James Talley)

This Court should also refuse to find fault with counsel's questioning of Chad and Justin Rice, James Talley, and Engle's acquaintances that lived at Westgrove Road, and counsel's failure to call or subpoena other witnesses, including K.M. or Damir Abdullaev's Facebook friends (ground nos. 7, 11, 12, and 13).

With respect to the examination of the FBI's forensic examiner, James Talley, Engle claims that defense counsel should have inquired whether the seized camera contained other memory showing pictures of Engle's acquaintances and that such testimony could have discredited the claim that Engle lied to the Greenville County Sheriff's Office investigator about his address and location in early September 2008. Trial Tr. 165-66. This claim, however, ignores Engle's other lies to this investigator as discussed above, and that Detective Everett went to the address in question at the time and attempted to locate Engle or K.M. at that location, without success. Trial Tr. 283-85. Pursuing this line of questioning would only have served to cast attention back to false Engle's communications with the South Carolina investigator and Engle's attempt to hide the fact that K.M. was with him at that very time. Rather than doing that, defense counsel briefly cross-examined Detective Everett about the adequacy and extent of his investigation at the 33rd Street address provided by Engle. Trial Tr. 299-300. Nothing more was required.

(Damir Abdullaev and Rustem Zaripov)

In a similar manner, Engle's challenges the adequacy of the questioning of some witnesses and the failure to call others in relation to the quantum of proof that the 13 year old K.M. was with Engle from late August through mid-September 2008. For example, Engle contends that defense counsel should have called an unidentified woman noted on a Damir Abdullaev's (a resident of Westgrove Road who did not testify) Facebook page. Engle reports that this mystery witness would have offered testimony useful in attacking the credibility of Abdullaev, as well as that of Rustem Zaripov and Kathryn Owen[11] (other residents of Westgrove Road who did testify), and to show apparently that she, rather than K.M., was present at Westgrove Road in September 2008.

Aside from the lack of any affidavit supporting Engle's unsubstantiated claims, the failure to call such a witness does not constitute ineffective performance for a couple of reasons. First, Damir Abdullaev was not called as a witness at trial and no need existed, therefore, to attack his credibility. Second, defense counsel effectively examined Rustem Zaripov about his pending federal criminal charges on identity theft and theft of mail, his hiding in the house at Westgrove Road at the time of Engle's arrest, his desire for a reduction in sentence, the fact that he was facing deportation following the conclusion of his sentence and overstayed his visa, his participation in a fake marriage to support his immigration status, his excessive use of alcohol and drugs, and his ongoing anger at Engle for bringing police into his life. Trial Tr. 315-16, 326-30. This cross-examination more than adequately presented to the jury issues weighing upon the assessment of Zaripov's credibility, which counsel argued to the jury in closing. Trial Tr. 776 ("you can't get a more biased witness . . . than Mr. Zaripov"). Lastly, the decision about which witnesses to call at trial is a tactical decision left to the sound discretion of counsel, even when

---

[11] Ms. Owen's testimony is discussed below.

the defendant disagrees.[12]  *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010); *see*

*Goodson v. United States*, 564 F.2d 1071, 1072 (4th Cir. 1977) (noting reluctance to second

guess trial tactics left to counsel, including failure to call witness).

(Chad and Justin Rice)

In same manner, Engle challenges counsel's questioning of his onetime friend, Chad

Rice, and his 15-year-old son, Justin, both of whom testified about statements Engle made to

them about K.M. and A.M., when he stayed with them during the summer of 2008, and about

communications they received from Engle after his arrest attempting to obstruct the investigation

of his activities.  Trial Tr. 347-76 and 402-30.  Justin Rice also testified that, close to the start of

the school year in August 2008, Engle brought a girl, who appeared to be about 13 years old,

who he identified as "K," to the Rice home to try to prove to Justin that "K" was a real person.

Trial Tr. 352-53.

Engle claims that the counsel failed to bring out that Chad testified "K" was from

Hampton and Justin said she was from South Carolina.  This, however, was evident in their

testimony, and needed no further elaboration, and defense counsel explored on cross-

examination whether there were, in fact, two different persons with the name "K."  Trial Tr. 350,

370-71, and 406.  Similarly, Engle incorrectly claims that counsel failed to try to develop that the

"K" Justin saw was seen at a time other than when K.M. was missing.  In fact, however, counsel

asked Justin to specify when Engle brought "K" to their home and Justin said it was in August,

but could not remember the exact date.  Trial Tr. 371.

---

[12] Similarly, Engle's complaints in ground 12 concerning various other matters that Mr. Zaripov was not questioned about and government counsel's alleged leading questions to Mr. Zaripov fail to show counsel's performance was deficient.  Having shown and argued to the jury that ample grounds existed to closely scrutinize Mr. Zaripov's testimony, counsel had no need to ask every question that Engle or anyone else might think of with the benefit of hindsight.  Nor did the undersigned improperly ask leading questions of Mr. Zaripov.

Engle further claims that counsel failed to explore whether, in exchange for his testimony, Chad Rice received a lighter state sentence for a misdemeanor guilty plea to discharging a gun in the city, about which he testified on direct examination. Trial Tr. 427. No such deal was reached with the United States and, if it existed, counsel would have disclosed it to the defense with other *Giglio* material. Nor would Chad Rice have needed such a deal in conjunction with the misdemeanor charge at issue.[13] Nor is there any evidence to support Engle's claim that Chad Rice sought assistance in conjunction with a family member's immigration matter.

Engle's claim that Chad and Justin Rice acted at the government's behest and as government agents when communicating him and that counsel failed to asset this issue is also unsupported and incorrect. Moreover, the letters and telephone call that the United States offered into evidence at trial were letters and a call mailed or placed by Engle to Chad and/or Justin Rice. *See* GX 46A, 47A, 48A, 49A, 50A, and 50B; Trial Tr. 416. With respect to such letters, although counsel never asked whether Chad Rice could identify the handwriting as Engle's, inquiry on this point would have been pointless because Justin and Chad Rice both testified on direct examination that the letters were from Engle, who was then incarcerated at the Virginia Beach city jail. Trial Tr. 363-668, 412-19, and 426-28. Engle's authorship is also made plain by the contents of the letters. Finally, Engle's claim that counsel failed to object to the fact that the government somehow corrupted Chad Rice's testimony by asking him whether he could authenticate a speaker in certain recorded telephone calls is without merit. Pursuant to Rule 901(b)(5) of the Federal Rules of Evidence, Chad Rice testified that he was familiar with Engle's

---

[13]Rice's criminal history, which was disclosed with other *Jencks/Giglio* materials to defense counsel before trial, reflects he was found guilty of the misdemeanor discharge of a weapon in or across a road and sentenced to a *suspended* sentence in May 2009 of 12 months and 5 days.

voice as a result of their prior friendship and stated that he recognized that voice on certain recorded telephone calls later received into evidence. Trial Tr. 425-26.

In conclusion, counsel prudently decided not to spend excessive defense capital on contesting K.M.'s presence in Virginia. This strategic decision was sound because, as defense counsel argued to the jury, Engle faced no federal charge for transporting or having sexual relations with her. Moreover, substantial evidence, both from witnesses and other corroborating records proved that K.M. was, in fact, with Engle from late August through September 16, 2008. This evidence included: (a) Engle's text messages to K.M. soliciting her to come stay with him in August 2008, GX 4C-4M; (b) the cell site records showing Engle's trip to the vicinity of K.M.'s South Carolina hometown on August 29, 2008 and his return to Virginia the same day, GX 74, and the subsequent reporting of K.M.'s disappearance in South Carolina; (c) the fact that the missing K.M. was found, along with Engle himself, by North Carolina police on September 16, 2008 at Engle's mother's home, after residents of Westgrove Road told Engle he and K.M. had to stay elsewhere; (d) the finding of K.M.'s DNA on a sheet recovered from the Westgrove Road location, where Engle himself was later arrested; and (e) Engle's admissions in various letters and telephone calls about his spending time with K.M. and his sexual activity with her including, for example, Engle's November 18, 2008 letter to K.M. discussing that she may be two months pregnant and carrying his child, GX 11A. In the face of this evidence and Engle's numerous written admissions, counsel properly focused on trying to convince the jury that while incarcerated, Engle could not have enticed K.M. to engage in new sexually explicit conduct, as charged in counts 6-8 of the indictment. Trial Tr. 768-73. Engle has not shown that this

strategic decision was deficient and no good reason exists to second guess it now. *See Stamper v. Muncie*, 944 F.2d 170, 178 (4th Cir. 1991)(rejecting petitioner's questioning of counsel's trial strategy as "Monday morning quarterbacking").

**2.    Claimed Failure to Adequately Question Kathryn Owen Due to Alleged Conflict of Interest (Ground No. 7)**

Similarly, as part of this same effort to shift blame from himself to defense counsel and cast doubt on whether K.M. was present with him in Virginia, Engle also claims that defense counsel labored under a conflict of interest, which resulted in an inadequate cross-examination of Kathryn Owen at trial and the decision not to subpoena bank records pertinent to her testimony. This claim is also without merit.

Ms. Owen was one of a group of Russians, including Rustem Zaripov, who used to live at Westgrove Road. Trial Tr. 256-57. At trial, she testified that Engle occasionally spent the night at this residence and about how, in October 2008, she returned home to find Engle there with a young girl who appeared to be just 13 years old. Trial Tr. 258-59. When shown a photograph of K.M., Ms. Owen identified her as the girl she saw with Engle. Trial Tr. 260-61, GX 1. On the eve of trial, both defense counsel filed a motion to withdraw stating that Mr. Colgan only then realized that Ms. Owen was the adopted daughter of a couple of former neighbors and friends of his. Doc. No. 89. The United States opposed the motion to withdraw. Doc. No. 90.

After hearing the matter, this Court denied the motion, after finding that the couple in question had moved from Mr. Colgan's neighborhood roughly 8-9 years earlier, that Mr. Colgan had met Ms. Owen only one or two times years earlier when she roughly 15 to 17 years old, and determining that Mr. Colgan had no real relationship with the witness and only a limited relationship with her parents. Trial Tr. 3-6. The Court also directed Mr. Colgan's co-counsel,

Assistant Federal Public Defender Larry Dash, to conduct the cross-examination of Ms. Owen. Trial Tr. 5-6.

Claims of ineffective assistance based upon the existence of a conflict of interest are not governed by the *Strickland* standard noted above.  Rather, the litigant must show "(1) that his lawyer was under an actual conflict of interest and (2) that this conflict adversely affected his lawyer's performance."  *United States v. Nicholson*, 475 F.3d 241, 249 (4th Cir. 2007)(citations omitted).  To establish an actual conflict of interest, a litigant must show that counsel's interests "diverged [from the client's] with respect to a material factual or legal issue or to a course of action."  *Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir. 1998)(*en banc*)(internal quotation marks omitted).  To establish an adverse effect, the complainant must prove by a preponderance of evidence that:  (1) there was a plausible alternative defense strategy that counsel might have pursued; (2) that this strategy was objectively reasonable based on the facts known to counsel at the time the tactical decision was made; and (3) a link existed between counsel's failure to pursue the alternative strategy and the actual conflict.  *Nicholson*, 475 F.3d at 252.

Aside from the mere assertion that Mr. Colgan's "personal relationship with [Ms. Owen's parents] . . . adversely affect[ed] the cross examination of [Ms.] Owen" and this prejudiced Mr. Engle,"  Def. Motion at 42, Engle provides no evidence from which this Court could conclude that Mr. Colgan had an actual conflict of interest in this case.  The test for such a conflict is set forth in Rule 1.7(a)(2) of the Virginia Rules of Professional Conduct which provides that such a conflict exists if "there is *a significant risk* that the representation of one or more clients will be *materially limited* by . . . *a personal interest of the lawyer*."  Va. Rules of Prof. Conduct 1.7(a)(2) (2009)(emphasis added).  By way of example, the comment to the Rule indicates that a lawyer's personal interest creating such a conflict may include a "romantic or other intimate personal

relationship . . . ." *Id.* at comment 10. No such risk, significant or otherwise, existed in this case as the Court's inquiry of defense counsel demonstrated.

Nor has Engle shown an adverse effect resulting from any claimed conflict. For the reasons discussed above, Engle's post-conviction focus on disproving K.M.'s presence with him in late August and early September 2008 is misguided. And while he correctly notes that Ms. Owen placed K.M. with Engle at Westgrove Road in October 2008 (when K.M. had been returned to her parents in South Carolina at that time) -- as defense counsel re-emphasized in cross examination -- Ms. Owen also testified that Engle brought only one young girl to stay with him at the house and identified a photograph of K.M. as the girl in question. This effectively short-circuited the implausible, alternative strategy Engle now favors. Having shown that Ms. Owen's testimony was at odds with the timeline of K.M.'s disappearance, defense counsel apparently and correctly decided not to challenge or re-emphasize her identification of K.M. or to attack her credibility, given Engle's admissions and the other evidence discussed above. Because the Sixth Amendment "does not provide a basis for disappointed clients to launch after-the-fact attacks on objectively reasonable strategic decisions of their trial attorneys," *United States v. Dehlinger*, 740 F.3d 315, 325 (4th Cir. 2014), this Court should also reject Engle's conflict of interest claim.

### 3. Claimed Failure of Counsel to Offer Certain Evidence, Argue Certain Claims, or Object to the Admission of Evidence and Other Trial Matters (Ground Nos. 3-4, 8-9, and 11-13)

Engle asserts counsel failed to effectively represent him at trial in numerous other ways. He claims that counsel failed to object: (1) to the admission of two letters from K.M.; (2) to testimony by Ashley Reece about K.M.'s age; (3) to the release of Investigator Tysha Bracken as

a potential witness; (4) to his pre-trial detention; and (5) to the Court's alleged failure to follow through in placing a potential juror back in the jury pool.

Engle also claims that counsel failed to put on a defense case and to raise or to argue that: (1) the jury should be required to find venue as to count one; (2) he had been entrapped and his right to privacy violated by monitoring of jailhouse telephone calls, which counsel should have sought to suppress; (3) the communications charged in the enticement counts were like those in the witness tampering counts and were made with the single purpose of securing Engle's release from jail; (4) the absence of a substantial step supporting the enticement counts; (5) the government's failure to subpoena K.M. and her parents with respect to K.M.'s age and the identification of K.M.'s voice; (6) Engle had a female other than K.M. with him at Westgrove Road in October 2008; (7) Engle believed A.M. was over age 18 when he wrote letters to Chad and Justin Rice seeking to obstruct the investigation; (8) Engle's intent not to obstruct justice when writing letters to potential witnesses, but rather to prevent A.M. and K.M. from learning about one another; and (9) the absence of proof that the enticement and obstruction letters sent to K.M. and/or her mother and to the residents of Westgrove Road were mailed.

Engle also claims that counsel failed to offer testimony or evidence: (1) about certain bed sheets from Engle's North Carolina home that allegedly completed and matched the sheet seized from Westgrove Road containing K.M.'s DNA; (2) about Engle's intent to go to Tennessee, rather than South Carolina, after his release from jail, and the true meaning of his statement that he would not "make it out of the parking lot;" and (3) by subpoenaing K.M. to testify on his behalf about Engle's and her intention to marry, their understanding about South Carolina law, and about various other matters. For the reasons discussed herein, counsel performed at high level in representing a difficult client who, in many respects, was his own

worst enemy and Engle has failed to demonstrate how the presence of any such alleged errors would have led to a different result.

(K.M.'s Letters and the Decision Not to Subpoena Her)

Following his arrest on October 24, 2008, the trial evidence proved that Engle took extraordinary efforts to tamper with almost every witness, including A.M., K.M., and K.M.'s mother C.M., each of whom knew about or possessed evidence pertaining to his relationship with these minor girls.  Counts 9-11 charged that, beginning just five days after his arrest, Engle called and wrote K.M. and C.M. and asked them to provide a statement that K.M. had never been to Virginia, that nothing happened between her and Engle, and that the Greenville County Sheriff's Office forced K.M. to make false statements in this regard.  Government exhibits 17 and 18 were signed statements from K.M. saying the very things that Engle wanted her to say, which were provided to the FBI case agent by Engle's mother in late January 2009 (presumably at Engle's request).  Trial Tr. 680-82.  These statements were not inadmissible hearsay because they were patently false and were not offered to prove the truth of the matters contained therein.  Fed. R. Evid. 801(c)(2).  Therefore, defense counsel had no basis upon which to object to them and they were properly admitted to prove that Engle's efforts to tamper with witnesses bore fruit.

To the extent that Engle wanted defense counsel to call K.M. to testify to such matters, no need existed for her testimony because the very statements he asked her to make were admitted into evidence.  Nor was counsel deficient in failing to subpoena K.M. to testify at trial about any other matters, including any objectionable testimony about her or Engle's understanding regarding South Carolina law.  *See* Doc. No. 72 (opinion noting that counsel may attempt to locate and interview K.M. and use compulsory process to try to obtain her testimony).  As Engle well knows and as the call/letters described in counts 9-11 attest, K.M. made

contradictory statements about her activities with Shawn Engle, often at his request. GX 7A, 9A, and 11A. Leaving aside Engle's suggestion that K.M. should hide herself to short-circuit efforts to prosecute him, that she regularly ran away from Department of Social Services custody, and would have been difficult to locate and subpoena, GX 21A at 12 ("if they are unable to bring [K.M] to my trial . . . they have to dismiss my charges"), GX 9A at 6 ("I'm well aware [K.] has to hide until her 18th birthday"), Trial Tr. 184-85 and 463-64, Doc. No. 55 and 69, defense counsel reasonably did not subpoena her and run the substantial risk that, once on the stand, she might give testimony damaging to Engle's cause and fatal to his defense on the enticement and witness tampering counts.

(Evidence of K.M.'s Age, Her Voice, and the Release of Investigator Tysha Bracken)

At trial, the United States offered a certified copy K.M.'s birth certificate into evidence, along with testimony and proof about K.M.'s age from multiple other sources, including Kathryn Owen, Justin Rice, Chad Rice, Investigator James Perry, and K.M.'s MySpace profile page. This evidence included testimony from Ashley Reece, K.M.'s Department of Social Services foster care case worker in South Carolina, who got to know K.M., her siblings, and her parents and who also testified that K.M. was 14 and identified her voice on certain jailhouse telephone calls made by Engle. Trial Tr. 454-58. Given her knowledge of and responsibilities with respect to K.M., counsel did not act deficiently in failing to object to this testimony. And, contrary to Engle's assertions, counsel objected to the introduction of a certified copy of K.M.'s birth certificate and argued in closing that the government should have subpoenaed K.M. or her parents to establish her age. Trial Tr. 154-55 and 770-71.

Investigator Tysha Bracken worked for the Greenville County Sheriff's Office and was expected to be a government witness at trial. Before trial and in compliance with the Discovery

Order, the United States timely disclosed any potential *Jencks* materials, including prior police reports she may have authored. Defense counsel made use of these reports and inquired about the information they contained in cross-examining Investigator Jim Perry, who worked with Investigator Bracken. Trial Tr. 221-22 and 228-29. After arriving in Norfolk and as discussed at the trial, Investigator Bracken became ill and was unable to testify at trial. Trial Tr. 231-32. When the United States initially requested that she be excused from testifying, the defense refused and the Court declined the request. *Id.* Later, however, defense counsel agreed that Investigator Bracken could be excused and she was released from the subpoena. Trial Tr. 321.

Engle claims that counsel improvidently agreed to excuse Investigator Bracken and that she could have been questioned about the timeliness of the government's discovery and the propriety of South Carolina's decision to charge Engle with kidnapping. As Engle's motion attests, however, the government not only disclosed the reports in question (which, in any event, pertained to matters that Engle already knew by virtue of his relationship with K.M.), but did so in timely fashion and the counsel made use of them at trial. In any event, testimony about such matters before the jury would have been objectionable, as irrelevant to the disposition of the pending federal charges. *See* Trial Tr. 179-80 (Court gave limiting instruction, at the request of the United States, noting that evidence of kidnapping charge offered only for background and context and that the defendant was not on trial for that charge and it should have no bearing on this case).

(Venue)

Engle also claims that defense counsel erred in failing to argue or request that the jury be required to find venue was proper for the charge in count 1. As discussed above, however, in both the trial and appellate court, counsel chose to mount an essentially legal attack on the proper

venue for the charge of sexually exploiting a minor by producing child pornography. This attack claimed that the only place where Engle's offense could have been prosecuted was Pennsylvania. Although both this Court and Fourth Circuit rejected this claim, *Engle*, 677 F. Supp. 2d at 885-87; *Engle*, 676 F.3d at 411-19, if successful, this challenge would have prevented Engle's prosecution and conviction on count 1 in the Eastern District of Virginia.

Having lost on that issue in the trial court and preserved it for appeal, counsel did not provide ineffective assistance in failing to argue or request an instruction or special verdict requiring the jury to find Engle committed one or more acts constituting count 1 in the Eastern District of Virginia, as charged in the indictment.[14] Counsel had no reason to contest this at trial because the *uncontradicted* trial evidence showed that Engle both engaged in acts enticing A.M. in Virginia and transported the sexual videotape he made in Pennsylvania back to Virginia, where Detective Everett seized it from his vehicle, as the Fourth Circuit noted in finding venue to be proper. *Id.* at 415-19. Indeed, if Engle's suggested claim had been raised, such a finding need only have been established by a "mere preponderance of the evidence," *Engle*, 676 F.3d at 412 (citation omitted), a standard readily met by the proof at trial. Finally, in *United States v. Martinez*, 901 F.2d 374, 376-77 (4th Cir. 1990), the Fourth Circuit noted that, where proof of venue is clearly established by direct or circumstantial evidence, a trial court's erroneous refusal to grant a defense request for an instruction on venue constituted only harmless error that did not provide cause for reversing the judgment of the district court. Because this rationale applies with equal force to this case, Engle also cannot show any prejudice from counsel's failure to raise this issue at trial.

---

[14] To the extent that Engle also contends that the Court's rejection of defense counsel's request for a special verdict form on the alternative ways in which the defendant could have been convicted on any specific count, Trial Tr. 717-18, should have been raised on appeal, the Court's giving of a unanimity instruction with respect to all of the counts and various ways in which each charged crime could be committed obviated the need for a special verdict form. Trial Tr. 825-26. Therefore, counsel did not err in failing to raise this issue on appeal.

(Jury Selection)

During the jury selection, defense counsel raised an objection, pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), alleging that the United States improperly exercised its peremptory challenges to strike 6 prospective male jurors.  At that time, the Court required and the government advanced gender neutral reasons for each of its strikes and noted that the prospective pool of jurors had a large number of males (27 males/16 females) and that the proposed jury was evenly divided between 6 males and 6 females.  Trial Tr. 86-99.  The defense never successfully impeached the government's neutral explanations for these strikes.  *See Purkett v. Elem*, 514 U.S. 765, 768 (1995)(government need not provide "an explanation that is persuasive, or even plausible," so long as discriminatory intent is not inherent in the explanation).  Notwithstanding this, and in spite of the Court's finding that the first 5 government strikes were supported by valid reasons, the Court concluded that the explanation for the 6th strike was a "little slim."  Trial Tr. 99-101.  Importantly, the Court never found and the record in no way supported a finding that the United States engaged in "purposeful discrimination."  *See Hernandez v. New York*, 500 U.S. 352, 359 (1991).  Nevertheless, in an apparent abundance of caution, the Court, without objection from defense counsel and after having initially discussed placing the last struck juror back onto the jury, instead decided to allow the defense to select a single, new juror, by removing the last person (juror #8) selected for the jury.  Trial Tr. 96, 100-04.  Given the opportunity to select a new juror, the defense elected not to exercise any of its remaining strikes and juror #34 was selected.  Trial Tr. 102-04.  Because no *Batson* violation occurred and because the defense gratuitously received the opportunity to select a new juror, counsel committed no error in declining to request that the Court place the last juror struck by the government onto the jury panel.  Moreover, having been reliably and fairly tried before a jury

comprised of 6 men and 6 women and convicted on all counts based upon overwhelming evidence, nor can Engle show any prejudice stemming from jury selection.

(Remaining Trial Claims)

Each of Engle's remaining trial claims is also specious and should be rejected. Counsel opposed the government's motion for Engle's pretrial detention and, after a July 10, 2009 hearing, the Court ordered the defendant detained pending trial due to the risk of flight and danger he presented to the community -- a fact repeatedly underscored by the defendant's later threats and witness tampering activities from his jail cell. Doc. No. 16. That Engle's enticement (and his witness tampering) communications also had the goal of helping to procure his freedom was also self-evident and any argument that this was Engle's sole motivation would not have been credible.

Engle's related claim that somehow counsel's alleged role in his detention led to a violation of his privacy rights and allegedly entrapped and caused him to commit the violations charged in counts 3-14 of the indictment is creative, but ridiculous. Engle's legal woes stemmed, not from counsel's performance or his pre-trial detention, but from Engle's own, persistent misconduct.[15] Engle was properly detained pending trial and, as a prisoner, had a legally reduced expectation of privacy. *See, e.g., United States v. Bagguley*, 838 F.2d 468, 1987 WL 35045, *5 (4th Cir. 1987)(noting that the plenary authority of prison officials to safeguard the security of jails authorizes use of policy to routinely monitor inmates' calls, in accordance with federal law); *see also* Trial Tr. 524-26 and 531-32 (testimony about regular monitoring of inmate calls and notice to inmates about practice). All of the recordings of Engle's jail house telephone calls were properly authenticated and received into evidence.

---

[15] Likewise no defense of entrapment would lie because such requires "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct." *Matthews v. United States*, 458 U.S. 58, 63 (1988). Neither is present in this case.

Engle's claim about the supposed failure to prove that he took a substantial step toward enticing K.M. was argued by counsel both to the jury and on appeal. Trial Tr. 769-70; *Engle*, 676 F.3d at 419-23. Counsel also argued at trial, contrary to Engle's claim, that the letters to Chad and Justin Rice were motivated by a desire to prevent K.M. from learning about A.M., rather than a desire to obstruct justice. Trial Tr. 773-74.

With respect to Engle's claims about mailings, the letters charged in enticement counts 6 and 8 each contained postmarked envelopes showing that that they has been mailed from Virginia Beach to South Carolina. GX 13A and 14A. Enticement count 7 involved proof of an interstate telephone call. Moreover, although not an element of the offense of witness tampering, the trial evidence established that the letters charged in counts 3-5 and 9-14 had, in fact, been mailed.

As to Engle's claim that Mr. Zaripov was mistaken in identifying the bed sheet with K.M.'s DNA upon it as belonging to him and from his residence at Westgrove Road and that the bed sheet was really part of a set of Engle's brought from North Carolina, counsel had no need to further develop this because Engle had already done so. When attempting to tamper with the Westgrove Road witnesses, Engle sent them the letter charged in count 12 that attempted to establish this very point about the bed sheet, GX 31A at 3, and the undersigned was forced to respond to it in his rebuttal argument at closing. Trial Tr. at 785.

No grounds exist to second guess counsel's performance in declining to put before the jury evidence about Engle's various other beliefs and intents by putting Engle on the stand as part of a defense case. Having seriously damaged counsel's efforts to defend him and/or to call him as witness in his own defense with his letters and telephone calls, Engle should not now be allowed to shift the blame to counsel for giving them so little with which to work. The many and

damaging statements contained in Engle's calls and letters made it difficult, if not impossible, to put Engle on the stand and/or to argue, in effect, that black is white and white is black. *Compare* Def. Motion at 64 (Engle's claim of alleged plan to return to Tennessee) *with* GX 14A at 7 (discussing his upcoming living arrangements with K.M. in South Carolina). For this reason, counsel diligently worked with what they had, vigorously challenged the government's case before and during trial, and argued to the jury, among other things, that A.M. effectively produced the sex videotape at issue, that the government failed to prove that Engle intended to entice K.M. because he allegedly intended to wait until she turned 18 before consummating his relationship with her, that ambiguity about who the speaker was also prevented a conviction for enticement on count 7, that Engle legally sought statements from K.M. and C.M. to give to his lawyer, and that the jury could not convict on any count supported by the unreliable testimony of residents of Westgrove Road. Trial Tr. 763-768. Nothing more was required.

### D. Engle's Appellate Claims of Ineffective Assistance Are Not Meritorious (Ground Nos. 2, 6-8, 10-11, and 13)

Engle also asserts that counsel mishandled his appeal to his legal detriment in numerous ways. To the extent that these claimed errors renew and/or flow from those discussed above, such as his claims regarding suppression of evidence, the purported conflict of interest, the handling of jury selection, entrapment, and placing the issue of venue before the jury, such claims should be denied for the reasons already stated.

Engle also contends that counsel failed to assert on appeal all of the issues raised in the defense motions for a judgment of acquittal and/or a new trial, including challenges to: (a) the sufficiency of the evidence on counts 1, 6-8, 9-11, and 14; (b) the propriety of the government's rebuttal argument responding to the defense's argument about the government's failure to call certain witnesses; and (c) the court's jury instruction defining the term "law enforcement officer."

As stated in the United States' opposition to these motions (Doc. No. 103) and detailed at length in the Court's post-trial ruling denying the same, none of these claims was meritorious. Doc. No. 104. Also, appellate counsel directly or indirectly raised two of these claims, relating to the sufficiency of the evidence on counts 1 and 6-8, and the appeals court conclusively rejected them. *Engle*, 676 F.3d at 418-19 (discussing evidence showing that Engle enticed A.M. with respect to count 1) and 419-23 (reviewing and finding "substantial evidence exists to support" convictions on counts 6-8).

Engle also claims that counsel erred in failing to appeal the trial court's denial of his motion to compel the United States to turn over contact information for K.M. and her guardian. This issue, too, was litigated and ruled upon by this Court. For the reasons stated in the United States' written response and the Court's ruling upon said motion, the defense arguments in support of the motion were without merit. Doc. Nos. 55, 69 (noting that, on January 23, 2009, just over a month before Engle's trial, K.M. had run away from a state facility where she had been staying), and 72; Suppr. Tr. 64-77. Having regularly encouraged K.M. to run away while maintaining his own secret means of contacting her, *see* Doc. No. 104 and the attached GX 80), Engle's related claim that either the Court or the United States prevented him from attempting to subpoena her for trial was and remains preposterous. As this Court noted in denying Engle's post-trial motions:

> At most, Defendant was limited in his ability to communicate with K.M. However, neither the Court nor the United States placed any limitation on Defendant's ability to subpoena K.M. to testify.

Doc. No. 104 at 25. Counsel also wisely declined to present this issue on appeal.

Finally, Engle claims that counsel also erred in declining to challenge the district court's upward variance from the advisory sentencing guidelines on appeal.[16] Before the sentencing hearing, Engle's advisory guideline range was 324-405 months. Due to counsel's efforts in successfully opposing three proposed guideline enhancements, this Court re-calculated the advisory guideline range as 262 to 327 months. *See* Sealed Statement of Reasons for Sentence at 7-13, and 15-16 (July 23, 2010). After considering the advisory guideline range, the pre-sentence investigation report, and the evidence offered at trial and sentencing, however, the Court imposed an upward variance and sentenced Engle to serve 480 months in jail. *Id.* at 16-26. Ample grounds, including Engle's sexual exploitation of A.M., his enticement of K.M., his concerted efforts to obstruct justice, his efforts to have a trial witness killed or incapacitated, his threats of violence against investigators, prosecutors, and their family members, and his history of violent and sexually predatory conduct supported this sentence. *Id.*

Counsel's tactical decision not to challenge the sentence on appeal wisely sought to avoid overwhelming and infecting Engle's other appellate claims with an extended review and discussion of Engle's wide-ranging misconduct. As recently noted by the Fourth Circuit, "the range of reasonable professional assistance is just as wide on direct appeal as it is at trial." *United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013). Even if some of the issues identified for appeal by Engle potentially possessed merit, which they did not, appellate counsel had no

---

[16] Engle's related claim that counsel should have insisted that the jury make any findings with respect to matters that led to an increased sentence is without merit because the case did not involve a mandatory minimum or a statutory maximum that changed as a result of any factual findings made at sentencing. *See Alleyne v. United States*, ___ U.S. ___, 133 S. Ct. 2151 (2013); *Apprendi v. United States*, 530 U.S. 466 (1999). After *Booker* and the advent of the advisory guideline regime, this Court was authorized to make factual findings at sentencing by a preponderance of the evidence with respect to guideline factors and to assess the advisory guideline range, in light of the 18 U.S.C. § 3553(a) factors applicable to the case. *See United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008)(holding that, so long as the guideline range is treated as advisory, the sentencing court may find facts by a preponderance of the evidence, provided that such facts do not increase a sentence beyond a statutory maximum); *United States v. Battle*, 499 F.3d 315, 322-23 (4th Cir. 2007)(Sixth Amendment not violated by imposition of a sentence based upon facts not found by a jury).

obligation to raise *each and every* non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)(defense counsel have no constitutional duty to raise every non-frivolous issue on appeal). Effective appellate advocacy often requires focusing only upon the most cogent appellate issues. *See Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000)("winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy")(quotation marks and citations omitted)). As a result, "[i]n applying [the *Strickland*] test to claims of ineffective assistance of counsel on appeal . . . reviewing courts must accord appellate counsel the 'presumption that [they] decided which issues were most likely to afford relief on appeal.'" *Id.* (quoting *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993)).

Here, appellate counsel selected three grounds for appeal, which focused upon the heart of the charges (count 1 and counts 6-8) lodged against Engle and an alleged procedural irregularity at sentencing. If the appellate court had accepted even one of these claims, Engle could have argued for a new trial and/or for a lesser sentence. The alternative claims which Engle now claims he wanted counsel to pursue were weaker than those actually presented on appeal. Also, asserting each of these alternative claims would have only served to detract from the strongest claims raised by appellate counsel. Accordingly, Engle has failed to demonstrate that counsel's performance in selecting, briefing, and arguing the issues raised on appeal fell below an objective standard of reasonableness. Likewise, he also cannot show that the decision not to pursue any alternative appellate claims resulted in prejudice.

## CONCLUSION

Accordingly, for all the reasons set forth above, the United States requests that this Court deny and dismiss Shawn Engle's motion to vacate, set aside or correct sentence.

Respectfully submitted,

Dana J. Boente
Acting United States Attorney

By: __/s/_____
Robert J. Krask
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
Phone: (757) 441-6331
Fax: (757) 441-6689
bob.krask@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 20th day of MARCH 2014, a copy of the foregoing

"RESPONSE OF THE UNITED STATES TO PETITIONER'S MOTION TO VACATE, SET

ASIDE OR CORRECT SENTENCE" was filed with the Clerk of Court using the CM/ECF

system, which will send  notification of such filing (NEF) to the following and a copy was

mailed, first class postage prepaid, to:

SHAWN FORREST ENGLE
#58772-083
FCI Marianna
Federal Correctional Institution
P.O. Box 7007
Marianna, FL 32447


_/s/_____
Robert J. Krask
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
Phone:  (757) 441-6331
Fax: (757) 441-6689
<u>bob.krask@usdoj.gov</u>